UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Christine DePrizito**

     v.                             Case No. 20-cv-1111-PB
                                       Opinion No. 2022 DNH 029

**Kilolo Kijakazi, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

Christine DePrizito challenges the denial of her application for disability insurance benefits under 42 U.S.C. § 405(g). DePrizito makes two arguments: (1) the Administrative Law Judge ("ALJ") did not properly address the medical evidence, and (2) the ALJ improperly relied on the vocational expert's unreliable testimony. The Commissioner asks me to affirm the ALJ's decision. After reviewing their arguments, I do not find reversible fault in the ALJ's decision and affirm it.

## I.   BACKGROUND

### A.   Procedural Facts

Christine DePrizito is a 51-year-old woman with some college education who last worked as a receptionist in 2017. Tr. 115, 117. DePrizito's initial application for disability benefits identified depression, anxiety, headaches, vertigo, gastroparesis, abdominal pain, and persistent vomiting as the "illnesses, injuries, or conditions" that impaired her ability to work. Tr. 108-09. DePrizito's first claim for disability,

which she filed in September 2017, was denied in November 2017.
Tr. 118-19.  Her subsequent request for reconsideration was
denied in September 2018.  Tr. 134.  DePrizito requested a
hearing before an ALJ, and the hearing was held in March 2019.
Tr. 148-49, 166.  After the ALJ denied DePrizito's claim, she
asked the Appeals Council to review the decision.  Tr. 202-03.
The Council later informed DePrizito that it agreed with the
ALJ's decision.  Tr. 206.  DePrizito now asks me to reverse the
ALJ's decision and remand her claim.

**B.   Medical Evidence and ALJ Determination[1]**

The ALJ's decision followed the typical five-step sequence
for determining whether DePrizito qualified for disability
benefits.  See 20 C.F.R. § 404.1520.  DePrizito cleared the
first step because she has not performed "substantial gainful
activity" since June 2017.  See Tr. 36; § 404.1520(4)(i).  At
step two, DePrizito established that she "[had] a severe
medically determinable physical or mental impairment that meets
[a statutory] duration requirement."  See § 404.1520(a)(4)(ii).
DePrizito presented enough evidence to convince the ALJ that her
anxiety disorder, depression, status post rectal cancer,
gastroparesis, and gastroesophageal reflux disease were severe

---

[1] Following the parties' lead, I will focus on the facts most
salient to DePrizito's claims.

impairments.  Tr. 36.  Besides those listed above, the ALJ
dismissed additional claims of cervical pain, a lump in
DePrizito's left breast, abnormal liver findings, obsessive
compulsive disorder, and obesity.  Tr. 37-38.  For the sake of
brevity, I will detail only the ALJ's findings that DePrizito's
challenges: that her headaches, migraines, and vertigo were not
severe impairments.

First, the ALJ concluded that the headaches and migraines
DePrizito complained of were not severe because "the medical
evidence [was] absent objective pathology supporting" those
ailments.  Tr. 37.  The ALJ highlighted evidence that the
"headaches and migraines persisted for many years preceding
[DePrizito's] alleged onset date" and that "they improved since
she began drinking water[,] taking magnesium," and receiving
"chiropractic treatment."  Tr. 37.

The ALJ then found that DePrizito's vertigo was not severe
because it was "absent an objective diagnosis" and "based upon
[DePrizito's] subjective reporting alone."  Id.  The ALJ also
noted that DePrizito "underwent workup and testing prior to the
alleged onset date based upon her reported vertigo, but [the]
findings were inconclusive."  Id.

At step three, the ALJ needed to consider whether any of
DePrizito's severe impairments "[met] or equal[ed] one of [the]
listings" set out by the Administration.  See

§ 404.1520(a)(4)(iii).  The ALJ determined that DePrizito did
not meet the two relevant listings for her mental impairments:
12.04, for "depressive, bipolar and related disorders," and
12.06, for "anxiety and obsessive-compulsive disorders.  Tr. 38.
See 20 C.F.R., Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06.

At step four, the ALJ assessed DePrizito's residual
functional capacity and determined that she could not do any of
her "past relevant work."  Tr. 41; see § 404.1520(a)(4)(iv).
The ALJ categorized DePrizito as having "the residual functional
capacity to perform light work as defined in 20 CFR 404.1567(b)
except that she can occasionally lift and carry 20 pounds and
frequently lift and carry 10 pounds."  Tr. 41.  She also found
that DePrizito could "sit, stand and walk for 6 hours each in an
8-hour workday"; "understand, remember, and carry out simple and
routine instructions for 2-hour intervals over the course of an
8-hour workday and 40-hour workweek"; and "adapt to simple and
routine changes in the work environment."  Id.  But DePrizito
could not "perform work that requires interaction with the
general public as a function of the job."  Id.

To support this RFC, the ALJ relied on several medical
source statements, including one from DePrizito's psychiatrist,
Dr. W.L. Grapentine.  DePrizito testified that she saw Dr.
Grapentine "once every four weeks."  Tr. 38, 87.  The ALJ,
summarizing her overall view of DePrizito's "regular[]"

4

appointments with Dr. Grapentine, noted that DePrizito
"consistently reported symptoms of irritability, but
progressively reported improvement in symptoms with medication";
"was consistently observed as without psychiatric abnormalities
or symptoms during both mental status exams and general
examinations across the longitudinal course of her treatment";
and never sought "emergency treatment for psychiatric
conditions."  Tr. 38-39 (citing Tr. 674-89, 694-725, 894-829,
949-58).  The ALJ also referred to Dr. Grapentine's extensive
records as providing evidence that DePrizito was "consistently
observed as appropriate in behavior and responsive with good eye
contact, normal speech, and normal thought process"; was able to
"regularly attend[] appointments without distress"; and "was
consistently observed with appropriate and linear thought
processes on mental status examinations."  Tr. 39.  Finally, the
ALJ cited Dr. Grapentine's records as evidence that DePrizito
"consistently reported improvement or management of symptoms and
was never observed with objective psychiatric symptoms."  Tr.
40.

Along with his records of specific appointments, Dr.
Grapentine submitted "a medical source statement . . . relating
to [DePrizito's] psychiatric limitations."  Tr. 40 (citing Tr.
726-28).  In that statement, recorded on a standard form
provided by the Social Security Administration, Dr. Grapentine

provided his assessment of DePrizito across various
competencies.  Tr. 726-28.  He also provided a brief written
assessment of her condition, describing her as "suffer[ing] from
extreme mood disorder" and as being "homebound."  Tr. 727.  He
continued that DePrizito's "depression and anxiety [had]
progressed to the point where the thought of leaving her home
provokes an anxiety attack," and that when she "is placed in any
setting outside her home, she begins to exhibit anxious
behavior, preventing normal daily function[ing]."  Id.

The ALJ discounted Dr. Grapentine's medical source
statement, explaining that "[t]here is no indication that Dr.
Grapentine conducted an examination because his statement
includes only opinions to limitations," so "it is unclear as to
the symptoms, observations, assessments, or tests that his
opined limitations are based upon."  Tr. 40.  Since the ALJ
could not "differentiate[] as to whether his opinion is based
upon the claimant's subjectively reported complaints versus an
objective examination by Dr. Grapentine," and because "[t]here
[was] no suggestion that he reviewed the claimant's medical
record," she concluded that "the basis of his opinion [was]
unascertainable, and may be based upon the claimant's
statements."  Id.  Dr. Grapentine's opinion was thus rendered
"unpersuasive."  Id.  Instead, the ALJ relied on evidence from
two state agency medical evaluators in assessing DePrizito's

functioning.  Id.  Their assessments supported a finding of
nothing "more than [] moderate limitation[s]," according to the
ALJ.  Id.

     The ALJ also considered DePrizito's testimony and written
statements, measuring DePrizito's personal assessment of "the
intensity, persistence and limiting effects of [her] symptoms"
against the "the medical evidence and other evidence in the
record."  Tr. 43.  The ALJ determined that DePrizito's account
of her symptoms and the medical evidence "are not entirely
consistent."  Id.  In particular, the ALJ pointed to Dr.
Grapentine's records and cited a report from a July 2017
appointment where DePrizito "reported that 'good things are
happening' and denied negative medication side effects."  Id.
(quoting Tr. 704).  The ALJ also cited a report from Dr.
Grapentine where DePrizito "reported that she was fired for
impulsive behavior and now is having occasionally [sic] panic
attacks like those she had when she was young" and that "[s]he
was not trying to get a new job for now."  Tr. 43.  The ALJ also
pointed to a subsequent visit report from Dr. Grapentine stating
that "things" for DePrizito "were slowly getting better," but
that she was "not reapplying for work until she feels better,
and was wondering about disability."  Id. (citing Tr. 708).

     The ALJ then cited another appointment report from Dr.
Grapentine, which reflected that DePrizito's "primary diagnosis

was moderate anxiety with difficulty leaving her home," "[s]he
was also diagnosed with depression," and, despite her "reported
continued irritability," DePrizito "was absent signs of
psychosis, thoughts of harm, or disturbed sleep."  Tr. 43-44.
Another appointment report cited by the ALJ from December 2017
reported "consistent symptoms."  Tr. 44.  The ALJ also cited a
report from a February 2018 appointment, "indicat[ing] that
[DePrizito] was actually doing a little better than in the
past."  Tr. 45.  The ALJ cited more reports from another pair of
counseling sessions, noting, generally, that they relayed
DePrizito's condition as "consistent" with her medication's
degree of effectiveness ranging from "minimal[]" to "somewhat."
Id.

     The ALJ also cited records from three appointments with Dr.
Grapentine in September, November, and December 2018.  Id.
These appointments took place after Dr. Grapentine submitted his
medical source statement.  See Tr. 728.  According to the ALJ,
the record from the September appointment flagged that
DePrizito's "anxiety was increased but she had no medication
concerns."  Tr. 45.  The reports from the November and December
appointments were, according to the ALJ, mixed.  Id.  Both
reports specified that DePrizito "was doing well on" her
medication, and the December report stated that "[s]he reported

doing well" but also that "the last week was horrible, and she wanted to punch people but didn't and cried all week."  Id.

Next in the ALJ's decision, she used Dr. Grapentine's reports (on top of those from other medical providers) to analyze the consistency of DePrizito's testimony at her hearing. Tr. 46.  The ALJ again discounted much of the testimony, referencing such evidence as Dr. Grapentine's account of DePrizito's mental state as "without abnormalities and within normal limits during mental status examinations."  Id.  Still, the ALJ recognized "the persistence of symptoms despite management with medications" and concluded that "the record as a whole supports that the claimant has mental limitations."  Id.

The ALJ then reiterated why she found Dr. Grapentine's opinion "unpersuasive."  Tr. 47.  She again noted that it was "absent any objective findings on which he based his opinion"; there was "no indication that [he] conducted an examination and it is unclear if there are any symptoms, observations, assessments, or tests from which his opinion derived"; there was no way to "differentiate[] as to whether his opinion is based upon [DePrizito's] subjectively reported complaints verses and objective examination"; there was "no suggestion that he reviewed [DePrizito's] medical record"; that it was "inconsistent with the medical evidence" which showed that her "symptoms [were] mostly managed with medication"; and that Dr.

Grapentine "never observed [her] with psychiatric symptoms, and only consistently reported that her anxiety prevented her from leaving her home." Id.[2]

After explaining why other medical opinions were either persuasive or not, the ALJ concluded that her RFC determination was "supported by the record as a whole, including the claimant's testimony and subjectively reported statements, treatment notes, and assessments by the claimant's providers, and objective examinations." Id.

At the fifth and final step of the SSA's disability decision-making structure, the ALJ relied on vocational expert ("VE") testimony that DePrizito could perform "other work." See 20 C.F.R. § 404.1520(a)(4)(v); Tr. 49, 99. In his testimony,

---

[2] I will summarize some of the other medical source findings the ALJ made. She first found that the doctor who provided the opinion for DePrizito's initial unfavorable determination, Dr. J.H. Hall, was unpersuasive because Dr. Hall found that DePrizito "did not have any severe physical impairments." Tr. 46. This strayed from the medical evidence that "the claimant has gastroparesis." Tr. 46. Still, the ALJ found that the doctor who provided the opinion for DePrizito's reconsideration decision, Dr. Donald Trumbull, was persuasive. Id. Dr. Trumbull stated that DePrizito's gastroparesis limited her to jobs that only required light work requirements. Tr. 46-47. The ALJ also relied on the opinions of two providers, Brian Stahl, Ph.D. and Thomas Knox, Ph.D, on DePrizito's mental limitations. Tr. 47. Their conclusions -- that DePrizito could "work in 2-hour blocks performing simple tasks," could not "work with the general public," could work "with supervisors and coworkers," and was "able to adapt to simple changes" -- were "consistent with" evidence that the claimant "was able to perform household chores; read; interact with friends, family, and providers; [drive]; and shop." Tr. 47.

the VE explained that he had used a computer program to determine whether three representative jobs existed in the economy that could accommodate DePrizito's RFC.  Tr. 102.  The ALJ subsequently determined that DePrizito was not disabled and dismissed her claim.  Tr. 49.

In her decision, the ALJ listed the VE's three "representative occupations" that an individual with DePrizito's age, education, work experience, and residual functional capacity could perform:

- Assembler (DOT#729.687-010, light, SVP 2) with approximately 50,000 in the national economy.
- Sorter (DOT#922.687-086, light, SVP 2) with approximately 40,000 in the national economy.
- Inspector (DOT#559.687-074, light, SVP 2) with approximately 43,000 in the national economy.

Tr. 49.  Given the availability of these jobs, the ALJ concluded that DePrizito "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  Tr. 49.

During the hearing, DePrizito's attorney questioned the VE about his methodology.  The VE confirmed that his "testimony [was] consistent with [his] experience, as well as the Dictionary of Occupational Titles[.]"  Tr. 100.  In response to further questioning from DePrizito's attorney, the VE outlined his specific process for "generat[ing] [his] estimates of job numbers[.]"  Tr. 102.  He used a program called "SkillTran Job

Browser Pro" combined with "governmental published data" to calculate the estimates.  Tr. 102.  When DePrizito's attorney asked if the VE had made any "modifications to the default settings in the Job Browser program," the VE explained that he only "adde[ed] and/or remov[ed] jobs, depending on the industry, and the availability of the jobs within that industry."  Tr. 102.  DePrizito's attorney then asked if the VE could "identify what industries were added to any of the occupations that you've cited," and the VE responded that he "wouldn't be able to . . . off the top of [his] head" because "there are hundreds if not thousands of different industries in there that I would have to review . . . before I could make a confident assessment as to which ones I would be removing and/or adding."  Tr. 102-03.

Elaborating, the VE suggested, as an example, that he knows that the coal mining industry does not employ any cashiers, so if he was assembling the national number of cashiers, he would exclude the coalmining industry so that any job in there with "cashier attached . . . would be removed."  Tr. 103.  Pressed further, the VE clarified why he had not "ke[pt] a record of . . . what sort of adjustments [he had] made" by pointing to the sheer number of entries "in the DOT" -- "hundreds of thousands of jobs," as he put it -- an amount that is too massive "to try and filter through."  Id.  Instead, he explained, the jobs data is "all within SkillTRAN Job Browser Pro, which utilizes that

for us," so he "just remov[es] industries that are not
applicable to the job that [he] is researching."  Tr. 103-04.
Furthermore, the number of "jobs that are being removed" from
any "specific industry" would be difficult to determine, the VE
added, because "there are thousands of potential jobs within an
industry that we have to go through."  Tr. 105.  As for how he
determined which industries would apply to the representative
jobs, the VE reiterated that he "utilize[d] [his] professional
experience."  Id.  Neither the ALJ nor DePrizito's counsel asked
the VE to further explain his methods.  Id.

## II.  <u>STANDARD OF REVIEW</u>

I review the pleadings submitted by the parties and the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner.  See 42
U.S.C. § 405(g).  That review is limited, however, "to
determining whether the [Commissioner] used the proper legal
standards and found facts [based] upon the proper quantum of
evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st
Cir. 2000).  I defer to the Commissioner's findings of fact so
long as those findings are supported by substantial evidence.
Id.  Substantial evidence exists "if a reasonable mind,
reviewing the evidence in the record as a whole, could accept it
as adequate to support his conclusion."  Irlanda Ortiz v. Sec'y
of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per

curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770. But her findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inferences from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for her, not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (cleaned up).

### III. <u>ANALYSIS</u>

DePrizito argues that her claim should be remanded for two primary reasons: (1) the ALJ improperly discounted Dr. Grapentine's medical source statement, and (2) the ALJ relied on faulty testimony from a VE.  I address each argument in turn.

### A.   Evaluation of Medical Opinion Evidence

DePrizito has a difficult burden to overcome when challenging the ALJ's decision to disregard Dr. Grapentine's medical source statement.  An ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to

14

any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a) (effective for claims filed on or after March 27, 2017).[3]  Rather, ALJs evaluate each medical opinion for persuasiveness according to these factors: (1) supportability; (2) consistency with other record evidence; (3) relationship with the claimant; (4) specialization of the medical source; and (5) other factors that "tend to support or contradict a medical opinion," such as the source's familiarity with other evidence in the record, or understanding of SSA policies and evidentiary requirements.  Id. § 404.1520c(c).

Supportability and consistency are "the most important factors," and an ALJ must articulate how she considered them in evaluating a medical opinion.  Id. § 404.1520c(b); see Purdy, 887 F.3d at 13 n.8 (discussing the equivalent regulation for SSI

---

[3] Because DePrizito's claim was filed after March 27, 2017, the "treating source rule" is not applicable to this case.  See 20 C.F.R. § 404.1520c.  The old rule "provide[d] that the ALJ should give 'more weight' to the opinions of treating physicians because 'these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.'"  Bourinot v. Colvin, 95 F. Supp. 3d 161, 175 (D. Mass. 2015) (quoting 20 C.F.R. § 404.1527(c)(2)).  "Under the new regulations, ALJs do not defer to, or give specific evidentiary weight to, any medical opinions."  Dany Z. v. Saul, 531 F. Supp. 3d 871, 881 (D. Vt. 2021).

claims).  Supportability is evaluated by measuring a medical

source's opinions against "the objective medical evidence and

supporting explanations."  20 C.F.R. § 404.1520c(c).  And

consistency is evaluated by comparing "a medical opinion . . .

with the evidence from other medical sources and nonmedical

sources in the claim" -- "the more consistent" they are, "the

more persuasive the medical opinion[] . . . will be."  Id.  The

ALJ also can consider the "[r]elationship with the claimant,"

the medical source's degree of "[s]pecialization," and "[o]ther

factors" such as the medical source's "familiarity with the

other evidence in a claim" and "whether new evidence . . . makes

the medical opinion . . . more or less persuasive."  Id.

     DePrizito first complains that the ALJ based her decision

to discount Dr. Grapentine's medical source statement on her

false determination that "there is no indication that Dr.

Grapentine conducted an examination" of DePrizito.  Tr. 47.

According to DePrizito, the ALJ's statement is false because

"the record documents that Dr. Grapentine observed and assessed

Ms. DePrizito over a number of years and documented a decline in

her condition coincident with her onset date."  Mot. to Reverse,

Doc. No. 9, 5.  DePrizito thus reads the ALJ's statement as a

claim that Dr. Grapentine never met DePrizito when in fact he

was her treating psychiatrist.  Accordingly, she asserts that

the ALJ did not properly evaluate the supportability of Dr. Grapentine's medical source statement.

I am unpersuaded by DePrizito's argument because it misreads the ALJ's decision. Rather than incorrectly claiming that Dr. Grapentine had never treated DePrizito, the statement DePrizito cites merely notes that Dr. Grapentine had not conducted any examination of DePrizito, an assertion that DePrizito does not contend is false. Tr. 47. The record leaves no doubt that the ALJ knew that Dr. Grapentine was DePrizito's treating psychiatrist because: (1) The ALJ cited extensively to Dr. Grapentine's treatment notes in her decision, Tr. 37-40, 43-45, 46; (2) DePrizito testified that Dr. Grapentine was her treating psychiatrist, Tr. 41, 87; and (3) the ALJ identified Dr. Grapentine by name in her decision when describing one of his treatment sessions with DePrizito, Tr. 45.[4]

DePrizito also argues that the ALJ improperly disregarded the medical source statement based on an incorrect determination that DePrizito's "symptoms [were] mostly managed with

---

[4] The Commissioner approaches DePrizito's argument from a different angle. She argues that the ALJ's statement about the lack of an "examination" is a "misstatement" to which I should apply the harmless error rule. See Comm'r's Mem. of Law, Doc. No. 11-1, 6-7. Since I do not view the ALJ as making a misstatement, I need not engage in a harmlessness analysis. See Kiesman v. Acting Comm'r, Soc. Sec. Admin., 2018 DNH 081, 2018 WL 1805534, at *5 n.3 (D.N.H. Apr. 17, 2018) (discussing the effect of an ALJ's "imprecise wording").

medication."  Tr. 712.  DePrizito contends that this finding is undercut by Dr. Grapentine's note from September 2017 that her medical regimen was only "minimally effective."  Tr. 712.  But in the reports the ALJ cited from two later appointments, Dr. Grapentine wrote that DePrizito "is on Luvox" (an anti-depressant) "and states she's doing well," Tr. 45, 925, and that she "is on Luvox and propranolol and she says she's doing well," Tr. 949.  Again, this is substantial evidence for the ALJ's conclusion.  Cf. Smith v. Berryhill, 370 F. Supp. 3d 282, 287 (D. Mass. 2019) (explaining how remand would be necessary if the ALJ disregarded a medical source opinion for "significantly flawed" reasons (quoting Johnson v. Astrue, 597 F.3d 409, 411-12 (1st Cir. 2009))).[5]

---

[5] DePrizito also challenges the ALJ's conclusions that her migraine headaches and her vertigo were not "severe" conditions. Tr. 37.  First, she claims -- without a citation -- that "migraines are not subject to any objective testing."  Mot. to Reverse, Doc. No. 9, 6.  In response, the Commissioner points me to Social Security Ruling 19-4p, but that ruling became effective four months after the ALJ's decision was issued.  See SSR 19-4p, 84 Fed. Reg. 44667 (Aug. 26, 2019).  Still, DePrizito presents no evidence that contradicts the ALJ's finding that "the medical evidence is absent objective pathology supporting the Claimant's headaches and migraines."  Tr. 37.  Nor does she counter the ALJ's additional findings, that the evidence shows that her migraines improved after "she began drinking water[,] taking magnesium," and receiving "chiropractic treatment."  Id.

As for her vertigo, DePrizito contests the ALJ's unwillingness to credit evidence from two providers: Dr. Yarian and N.P. Pomerleau.  Like with Dr. Grapentine, the ALJ could not find "a basis for their opined limitations" concerning DePrizito's

**B.    The Vocational Expert's Testimony**

At the fifth and final step of the SSA's disability decision-making structure, the ALJ relied on VE testimony that DePrizito could perform "other work," namely, the jobs of Assembler, Sorter, and Inspector.  See 20 C.F.R. § 404.1520(a)(4)(v); Tr. 49, 99.  The ALJ subsequently determined that DePrizito was not disabled and dismissed her claim.  Tr. 49.

DePrizito now argues that the VE's testimony was "fatally flawed" because the estimates he provided were not constrained by the precise job entries (each with a specific "industry designation" attached to it) in the Dictionary of Occupational Titles ("DOT").  Instead, she challenges the VE's decision to include jobs from an indeterminate number of other industries when calculating his estimates.  The Commissioner responds by highlighting the VE's ten years of experience, noting that he identified two bases for his estimates, and challenging DePrizito's interpretation and application of the jobs data.

---

vertigo.  Tr. 47.  The providers, in their joint medical source statement, wrote that DePrizito has "chronic vertigo."  Tr. 671.  The ALJ discounted this opinion because it was "inconsistent with their own treatment notes, which reflect a lack of physical symptoms during examinations."  Tr. 47.  The ALJ explained that the providers "never observed the claimant with an antalgic gait, ambulatory deficits, pain with weight bearing, or any physical symptoms supporting" the "extreme limitations" they outlined in their statement.  Tr. 47.  If DePrizito believes the ALJ mischaracterized the record evidence, she does not say so.

The heart of this dispute lies in DePrizito's assertion
that VEs must break down each of their numerical estimates by
industry designation.  The source of this purported requirement
is unclear.  The First Circuit has already explained that the
substantial evidence bar is surmounted by testimony from a
properly credentialed VE that refers to "job descriptions in the
DOT" and avoids "broad amalgams of jobs, some of which an
applicant might be able to perform but not others."  See Purdy,
887 F.3d at 16.  The testimony here meets that standard:
DePrizito does not challenge the VE's qualifications, and he
supported his opinions before the ALJ with no indication that he
relied on jobs that DePrizito could not perform.

It is true that the VE could not identify which industries
he included in deriving his estimates.  But DePrizito's argument
that the ALJ needed to adduce that information -- instead of
just relying on the VE's expertise -- is unpersuasive.
DePrizito identifies no authority requiring VEs to identify each
industry a given job exists within.  Nor does she detail how the
VE "tampered with the DOT definitions of the three jobs given
here," such that he included jobs she could not perform.  See
Mot. to Reverse, Doc. No. 9, 10.  And the ALJ's decision makes
clear that the three specific jobs are only understood to be
"representative occupations," the likes of which DePrizito could

perform.  Tr. 49 (emphasis added).  The Appeals Council's
decision echoes this characterization.  Tr. 6.

In protest, DePrizito quotes a section of the DOT which
explains that an "industry designation . . . often
differentiates between two or more occupations with identical
titles but different duties" and is "an integral and inseparable
part of any occupational title."  See Dictionary of Occupational
Titles: Parts of the Occupational Definition (4th Ed., Rev.
1991), U.S. Dep't of Labor, https://www.oalj.dol.gov/PUBLIC/
DOT/REFERENCES/DOTPARTS.HTM.  But that same section notes that
"[i]n compiling information for the DOT, analysts were not able
to study each occupation in all industries where it occurs," so
an industry designation "shows in what industries the occupation
was studied but does not mean that it may not be found in
others" and is "to be regarded as indicative of industrial
location, but not necessarily restrictive."  Id.  There is thus
no apparent inconsistency between the DOT and the expert's
testimony.

Furthermore, the caselaw that DePrizito cites in support of
her position is distinguishable.  In Clark v. Astrue, No. CIV.
09-390-P-H, 2010 WL 2924237 (D. Me. July 19, 2010), the
Magistrate Judge quoted testimony from the VE that their job
estimates were calculated using "groups of jobs as found in the
career infinite [sic] as generated by the department of labor."

Id. at *2.  The numbers provided included "all of the jobs in that grouping," some of which "include[d] positions that have a higher exertional requirement" and "a higher skill level" than the claimant could perform.  Id.  The VE made no such admission here.

And unlike in St. Pierre v. Astrue, No. 1:10-CV-104-JAW, 2010 WL 5465635 (D. Me. Dec. 29, 2010), the VE did not testify to relying on "occupational groupings" for "the individual representative jobs."  See id. at *2.  Moreover, neither case dealt with a scenario where the VE specifically relied on their expertise, which, again, strays from this case.  Cf. Dorman v. Soc. Sec. Admin., No. 4:12-CV-40023, 2013 WL 4238315, at *8 (D. Mass. May 21, 2013) (rejecting a VE's job estimates because they were "based solely on the numbers provided by the Job Browser Pro software and did not reflect any expertise on his part.").

Ultimately, DePrizito has not established that the VE had to provide the ALJ with representative occupations broken down by industry designation.  She has also not persuaded me that SkillTRAN, whose methodology the First Circuit approvingly referenced in Purdy, see 887 F.3d at 14, would somehow yield unreliable jobs numbers.  Nor has she articulated how, given the breadth of the data he needed to process, the VE could have used SkillTRAN to produce the level of specificity she seeks.  SkillTRAN relies on government-collected job data accrued "at an

aggregated group level, rather than by DOT occupation, which renders estimating the number of jobs available in the economy for a given DOT occupation no easy task." Id.  That difficulty is supposed to be addressed by the VE's knowledge and participation in the hearing, as was done here.

Given the ALJ's broad discretion, I must conclude that there was substantial evidence for her conclusion at step five that there are jobs DePrizito could perform.  See 20 C.F.R. § 404.950(c).

## IV.   CONCLUSION

Because DePrizito has not convinced me that the ALJ committed a reversible error in evaluating her claim, her Motion for an Order Reversing Decision of Commissioner, Doc. No. 9, is denied, and the Commissioner's Motion for an Order Affirming Decision of Commissioner, Doc. No. 11, is granted.  The clerk of the court will enter judgment in accordance with this Memorandum and Order and close the case.


        SO ORDERED.

                                /s/ Paul Barbadoro
                                Paul Barbadoro
                                United States District Judge

March 15, 2022

cc:  Counsel of Record